Appellant herein. Of the several issues that we raised in our briefs and on appeal, I would like to concentrate on the ineffective assistance of counsel issue. First, to explain to the court why we feel that there can be really little question that counsel's performance in this case did not rise to the level of the court's expectations. of competency, and secondly, why there is prejudice as set forth under the particular standard that is undermining the confidence in the verdict. As to the other issue... If I could just ask you, I hate to interrupt you right at the start, but on that issue of ineffective assistance of counsel, it would help me if you could address somewhere in your discussion why we should depart from the normal rule that such claims are not resolved at this stage on a direct appeal, and instead should go habeas, proceeding where, under 2255, counsel's performance in this case did not rise to the level of the court's expectations. You can make a full record. So in other words, what I'm thinking is, why shouldn't we dismiss that aspect of your appeal without prejudice? Yes, sir. I'll answer that right now before I even begin with my other comments. The issue is ripe. The district court judge found that the issue had been fully briefed, that both sides had been given absolute adequate opportunity to address that issue both in argument and by presentation of evidence. And there is an exception to the general practice that this is something that would be raised in a habeas proceeding post-appeal, where this was raised properly under a Rule 33 motion here in the district court and was, as I noted, properly addressed. The government had every opportunity, we presented evidentiary materials, and the government had every opportunity, which they forewent here, to either present a declaration of the trial counsel, depose the trial counsel, present their own expert testimony, if they felt there was any basis to contradict the expert testimony that we provided, or such other material or such other arguments as they wanted. And Judge Breyer, and again, I think very properly found that the issue was ripe, and the case law in this district certainly allows for this proceeding to have taken place. Molina, I believe, is the case, and we cite it in our papers, for this to take place. Our position on this, of course, is that we felt that this case was so egregious, given that the defense in this case, posited by the trial attorney, was that the credibility of the main government witness here, and I don't think there can be any really reasonable argument that he was not, the witness, Dillon, was not the main and central government witness, that his credibility was the central issue for the jury. And as a sub on that, and an important sub on that, that the question of whether or not this witness, Dillon, had given a sworn declaration which diametrically stated, under oath, the exact opposite, I guess that's redundant, but had stated the exact opposite of what he testified to, that is, the core fraud that the government asserted here, that is, that Mr. Cohen had stated that this company that he had founded, Ecast, was going to be acquired by Microsoft, and in the fullness of time, there would be this great increase in value. Well, in his declaration, Mr. Dillon, which was filed in response to early lawsuits in which some of these similar assertions were made, Mr. Dillon stated that Cohen had never promised that Ecast would be acquired or would be acquired within any specific period of time, or was going to do an IPO. The importance of that is that the entire government case was centered around the idea that the core lie that Cohen supposedly made, and that Dillon then republished widely, was that just the opposite. And in support of their argument for Dillon's credibility, and I don't know that this came out particularly clearly during the course of the arguments in the trial, but in strong support, the government asserted that a series of e-mails, this took up a great deal of testimony in the part, that this was a reference to this supposed acquisition. The difficulty with that is that these e-mails were sent before the declaration was signed by Dillon. The declaration was signed in the late spring of 2004, and the e-mails with these supposed code words, which were only explained to the jury as to their why Mr. Dillon, were dated before. And I would just cite to the record, because I think this is a critically important point as to the prejudice matter here, is that in the supplemental record at 1146, 1147, 1148, and 1149 are e-mails in March and April of 04 relating to central moving part. And of course, the declaration, which is 531A and 532A, the two declarations were signed on May 2nd of 2004. Help me understand if you can the context in which these declarations, you said they're in connection with an earlier lawsuit. Yes. Could you tell me a little bit more about that? Absolutely. I believe the plaintiff in that lawsuit was a man named Farrell, who appeared in as a government 404B witness. He alleged that He alleged in his lawsuit? In his lawsuit, yes. He alleged fundamentally that he had been promised that there would be an acquisition of the stock that he was purchasing. I don't know whether it was by Quest or Microsoft. It was one or the other, per his allegation, and that this wasn't true and that, therefore, he was swindled. And this was a lawsuit brought against whom? Against Samuel Cohen. Not against Dillon? I do not believe that it was against Dillon. I can check the record or have it checked right now. That's okay. Okay. But in response, and of course, Cohen denied that, and I believe in the fullness of time that case was settled. It didn't reach a trial or a verdict. But in response to that, Cohen wanted to make sure that the people who were buying ECAST stock through Dillon, this is the initial purchases of Cohen's shares in ECAST in 2002, 2003, and 2004, were under no misapprehension as to the type of claims that Farrell was making in his lawsuit. So he asked Dillon to execute these declarations, and Dillon did execute them. And these declarations said, and I'll very quickly state this because I don't want to necessarily use all my time on this, but he said Cohen never represented ECAST was about to be acquired or would be acquired within any specific period of time. This is why this document came into being. Now, of course, when moving forward four or five years, when the FBI came to Dillon and saw that Dillon had run his own parallel scheme here, when they had come to him, he said, and presented him with these declarations, he said, I've never seen them and I never signed them. But, counsel, weren't there several other witnesses who took the stand who were in the same position as Mr. Dillon, perhaps not with that document, but in the same position in the sense of saying, gee, that really looks like my signature and I didn't sign that document? Yes, there were the Mills. You're speaking about the Mills. And in the case of the Mills, just as in the case of Mr. Dillon, the handwriting expert, Mr. Moore, came in and provided the declaration that Mr. Mills signed that document. And in the case of Mr. Dillon, we had the original signatures. So Mr. Moore, who is an ex-law enforcement question document examiner, his report is in the record, stated with the highest degree of confidence that he is allowed to state under the rules of their profession that Dillon signed the declaration. With the case of Mills, he stated that he couldn't say that, but he could say that in his opinion it was Mills' signature because we didn't have the original signature. We had copies and we had a lot of other examples of Mills' handwriting. But because it wasn't the original signature at this time, he couldn't say that. But he said that the whole demonstration that the prosecution put on, the so-called red arrow demonstration where they had Mills on the stand and the prosecutor said, look at copies of these signatures. And he had him say, and look, this one is slightly different than this one, et cetera, et cetera. And he had red arrows pointing. And then Mills said, well, that's not my signature. Well, the handwriting examiner said, well, that's exactly the wrong thing. Now, this was the prosecutor isn't a questioning documents examiner. They didn't call a questioning documents examiner. So and our experts said that shows that it's not a forgery. That's exactly what you're looking for. Kagan. I'm sorry. Counsel, I know your time is limited and so if I could catch the chase. I'm here to answer your questions. I really want you to have an opportunity to answer my other questions, although I'm very familiar with the testimony about the handwriting expert and your arguments. Then I'll stop right now. And the other witnesses. I promise I've gone over it very carefully and I understand this case is very important to your client. But here's my problem and I want to give you a chance to respond. It just strikes me that this was not prejudicial as to your client because there was all kinds of reason for the jury to doubt the credibility of Mr. Dillon. He was he admitted to stealing $2.5 million for his own benefit. As you said, a parallel scheme. He had entered his plea and I think he was awaiting sentencing, right? So he had the very best possible picture, lots of ammunition for your client's team to be arguing that his credibility was pretty well shot. I want to answer your question on three levels. First of all, I do not believe, I do not believe that the cross-examination of Mr. Dillon was particularly effective in the sense that, first and foremost, what the main weapons that would have been available were not used. But secondly, secondly, the cross-examination, and we raise this as an issue, the cross-examination of him was frequently interfered with. And we feel in an inappropriate way, taking the thrust of the questioning out, and thirdly, that in the substance of the cross-examination, the impeachment was on collateral matters, i.e., have you admitted that you're a felon, that you committed criminal acts, et cetera, et cetera. But the impeachment as to the central issue of whether or not he had stated under oath at a prior time that the opposite of what he is stating under oath at the trial was untouched, and in fact, it was worse than that, because what happened there is not only did Dillon adamantly deny it, but the government argued in its closing argument that the signatures on the declaration were forged and that Cohen, who's not here, excuse me, I'm sorry, it's not the right court, that that. Kagan. Good gesture, though. It was good. Thank you. That Cohen had forged it. So it was a double whammy here, which is why it's not washed out by these other questions on cross-examination. It might be why a skilled trial counsel, though, wouldn't have wanted to touch it with a handwriting expert. It might be why his standard didn't fall below an objectively reasonable point. Thank you. I want to respond to that. The reason that counsel didn't want to touch it, we know. It's in the record. It is not disputed. Counsel made a mistake as to what the testimony was. And I think, and I want to submit to you. Well, counsel, what I've seen in the record, please correct me if I'm missing something, is that there's an e-mail exchange, and he said when he answered the question, trial counsel didn't have access to his file. He was traveling, am I right? Or is there more than that? He said that it was his belief that Dillon acknowledged his signature, and he argued to the jury in the e-mail. He said that Dillon acknowledged his signature. That was the e-mail back to me, because I wanted to find out, obviously. I know the man, and I asked him the question. Right. And he was traveling at the time? Did he not have access? No. He was in Washington. I think I recall something. Right. Right. But that's not the only one. There is the statement on the record at ER 285, at page 1965, where counsel states on the record, in arguing to the jury, that he said, yeah, that's my signature. I think I'm quoting it exactly. And he didn't say, yeah, that's my signature. It was just the opposite. He said, I never signed it, I never saw it. Well, didn't he say, it sure looks like my signature, and, by the way, I never signed it? Didn't he say both? Yes, but then that was – but that's out of context, because the context was he said it's a facsimile of my signature, and I don't know how it was produced. From that, of course, the prosecutor argued both at the sidebar, and we've quoted that, and he argued strongly to the jury that it was forged, which, of course, is the double – is the double problem. When counsel – when counsel raises this defense, if he raised it, for instance, to put it as simply as possible, I see I'm out of time, so. We'll let you say what you need to say, and if you run over, you run over. Okay. When a defense attorney raises a defense and pursues that defense at trial, he's absolutely obligated to present the evidence that is supportive of that defense and is available for that defense. And here, that was the defense. It's like you do an alibi case and you don't bring in the alibi witnesses, or you don't even investigate or interview the alibi witnesses. The problem in this area is that it's fact-sensitive always, and it's a reasonable standard always, and it's always possible to stand back and say, well, there was this or, well, there was that, which is why cases like Duncan and others – The time is running, so let me interrupt. Judge Breyer, in his ruling on denying the new trial, says, and in any event, even assuming – I'm putting in brackets – even assuming insufficient performance, when you get to prejudice, he says, the evidence – this isn't even close – that this made no difference. And I'm inclined to agree with him. Even if Dillon did sign it, the two May declarations are limited to what he said to what Cohen said to Dillon and what Cohen said to Glover. Help me understand why the – even assuming that he signed this, the evidence is still not overwhelming against your client. Well, because you have to see what was the – what did the case look like? The standard isn't quite – I think Judge Breyer was – I can't read into it. He didn't say it wasn't even close. Well, no, he did say it. That's exactly what he said. But – I'll read it to you. I've watched – and I watched all the evidence in the case. I saw the entire trial. And I don't for a moment think that the outcome would have been different. It doesn't even seem to be a close question. Okay. I stand corrected on that. That's right. But I think that it is not the right standard to say either harmless error or insufficiency or sufficiency of the evidence. No, it's prejudice. It's strictly prejudice. But it's prejudice that undermines the confidence in the verdict by looking at what the case would have looked like with the evidence that was left out and what the case looked like without it. And that's Duncan and Harrington and all those cases. It's a process issue more than it is a sufficiency issue, and which is why in this case it is so troubling that this pivot point of the entire case, made a pivot by the both of them, this was the central battle of the case, was done in such an inadequate and, I submit, ineffective way. Okay. I don't – and I remember having numerous arguments with Judge Breyer about this. I disagree with him then and I continue to disagree with him now. I don't think that this is the quality of problem which can be satisfied by a harmless error. Okay. Let's excuse now your question. Judge Fletcher, if I could just ask for a courtesy. Could we let counsel take an extra half, say 30 seconds at least, to tell me why there is a reversible error, if this is a contention, on any of the jury instructions? Well, what we argued about the jury instructions was there was a failure to instruct on vicarious liability. Excuse me. Yeah. We have argued that the failure to instruct on scheme and the failure to instruct on vicarious liability requires reversal of all of the counts of the secondary group of lenders who had no contact with Cohen and had – gave their money to Dillon and Dillon then forwarded some of that money to Cohen. And unlike the case that the prosecution just submitted, which you wrote a concurring in, in Gillian, which was talking about the reasonable foreseeability of normal course of business, phone or mail, this goes to the substantive area of the false statement itself. And we believe that you have to both instruct on section 2 or whatever theory of vicarious liability you're going to do, and that it requires purposeful, intentional action, willfully to cause. And it cannot be a reasonable foreseeability standard, and in fact, it isn't. I think the case in the Ninth Circuit is Berlin, US v. Berlin. That's the extent to which we have here raised the issues of instructional problems, but it's not quite – I don't know if I answered your question. I hope I did. I think you have. My orientation on this is that I still have some question whether we should, you know, be reaching before a 2255 and more of a record the IAC claim, but I think you've made a strong, you know, and spirited argument as to why we should address that. And it's kind of hard in a case like this to see a reversal on an evidence ruling. And that's why I was very interested in the – whether there was error on the jury instructions. Only in the failure in the government arguing, as it does, that there was reasonable foreseeability, as I think it's maybe – it's a dozen or so counts. We enumerate them when that's not the standard. And there was – this was a – not a scheme case. This was both argued as a specific item of misrepresentation case, and it was instructed along those grounds. There was no request for a scheme instruction or a vicarious liability instruction by the government. And as to the other point that you made, I don't know if I couched it in this language, but certainly our position is that the issue is right and that there was a waiver on the part of the government of ample opportunity to present evidence. In fact, we asked for continuance of the sentencing in order to have plenty of time to flesh out this record, and they opposed it. And that's in the record. There's no argument about that. Okay. Thank you. Well, thank you. We've taken you over time, but we will give you a chance to respond. Thank you very much. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. Cohen has raised a number of claims, none of which warrant reversal of the conviction or the sentence. I'd like to focus on the claims that were raised in the argument preceding and then answer any questions that you might have about, for example, the sentencing aspect, which wasn't raised. I'd like to first start off by talking about the jury instruction very quickly, which is that there the claim is that a scheme was never charged. And that's just a misreading of the jury instruction. In fact, only a scheme was charged. If you look at the government supplemental excerpt set 946, it charges that the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud or a scheme or plan for obtaining money by means of false or fraudulent pretenses. Later on in the same instruction, it specifically says that in determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole. So it's completely false to say that a scheme was not charged. In fact, only a scheme was charged. And a scheme was certainly proven, and the specific intent of Cohen to obtain money for himself via the lie that Microsoft was acquiring ECAST. And that did not require him to make any direct misrepresentations to the victims so long as he was using Dillon for it. And as Judge Kristin mentioned, there is a lot of evidence, other than Dillon, that he did make direct misrepresentations throughout the 2002 to 2008 time period. But there are arguments, right, counsel, forgive me for interrupting, there are arguments that he is, I think, as to several of the counts, he didn't make direct misrepresentations as to the second-tier investors. That's correct. And he wasn't required to because the specific intent pertains to the scheme to defraud. And, for example, in the telemarketing case, United States v. Inekwu, you have the director responsible for the frauds that are, or the misrepresentations that he concocted that are relayed by telemarketers that he hired or employed. In this case, Dillon is akin to that telemarketer. He is the conduit. He's the funnel by which these lies are being fed to this network of wealthy individuals affiliated with Vanguard. So the jury just needed to find, as I understand the law, pursuant to Schmuck and then, you know, much more recently, Ginian, that the scheme was carried out just the way Mr. Cohen intended it to be. Absolutely. In this case, vis-à-vis Mr. Dillon. Absolutely. And, of course, there is evidence as well that he intended specifically these misrepresentations to be conveyed to the second-tier investors. But the identity of the second-tier investors in some ways is irrelevant because that pertains to the wire element. And the wire element, as, for example, most recently was articulated in Ginian, simply needs to be proven to a reasonable foreseeability standard. So that, I hope, answers Judge Gould's questions about the instruction. I still have a bit of concern, so let me explain it. Maybe I can do a better job of articulating it. Let's say that Mr. Smith is charged with conspiring with Mr. Jones about subject matter A. And A is a big conspiracy, involves millions of dollars. And, you know, Jones helps Smith defraud people out of money for that. And then Mr. Jones, meanwhile, goes off and defrauds a bunch of other people on subject matter B. Why would Smith be liable for Jones' conduct as to subject matter B? And do the instructions here adequately convey to the jury that they're trying to determine if Cohen is responsible for some side fraud of Dillon? Absolutely, Your Honor. The jury instructions were adequate to cover that. The question was whether Cohen had a specific intent for scheme to defraud. And that the fact that Dillon might have had a side scheme or was skimming money off of that, that is a separate scheme. And he was indicted and he was charged and he pled guilty to that. The question is, I think, seems to be whether there couldn't be overlap between that. And absolutely there can be, which is that Cohen has a larger scheme. Dillon is a player in that scheme. But then he, through that process, also skims money off. So there's no question that Cohen was being indicted or being convicted for what Dillon did, which was stealing money from Dennis Kowalski and Asaki Bumani. But that the reason these people were giving money was to Dillon, to pass on to Cohen, was based upon Cohen's lie, which was that Microsoft was acquiring ECAST and various refundable bonds and fees had to be paid in order for the investment to actually come to fruition. That- Okay, I think you've answered my question on the, in terms of the government's position on the jury instructions. Thank you, yes. And I also want to just quickly mention that the Turalo and Stapleton cases, which are also telemarketing cases, are an act because in those cases, we're talking about a co-scheme reliability where you're talking about one telemarketer being responsible for a fellow telemarketer's role as opposed to the director of the entire scheme being responsible for what the lower people under his direction might be doing. I'd like to move on now. Can I just make- Yes. Really clear because the briefing does raise co-scheme reliability and my understanding of your response is the government didn't argue co-scheme reliability. That's not your theory of the case. Not at all, Your Honor. It wasn't charged. We didn't argue it and it's not relevant. Are we going to talk about sentencing? If you would like, Your Honor. Good. I have a couple sentencing questions. If you could just work it in. I want, I'm hoping you're going to address the Treadwell case. Yes. And the enhancement pursuant to, because the investment scheme to defraud was presented in a way that a charity would benefit. Yes. The charitable enhancement was accurately, correctly applied in this case because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable organization. Treadwell defines that as meaning just in the interest or for the benefit of, and gives us an example, an unaffiliated fundraiser for a charitable organization acts to obtain a benefit for the organization. And that's at 593 F 3rd, 1007 to 08. And that's exactly what Cohen was doing in this case. This would be an expansion that we've never applied it this way, have we? Not in this precise way. But in Treadwell, it was a similar type of situation where the people organizing money didn't say we specifically represent an organization or we're from a charity. We're not from the Fireman's Association. They said, if you give us money, we will be putting that towards humanitarian causes without even specifying an organization. Right. And this court said that that was enough to say that you could infer that it was going towards a charitable organization. But this was different. He said, I've got these founders' shares. They're $3 or something. We're going to hit it big, basically, in this Microsoft IPO. I'm oversimplifying, but you're going to wind up, the government's theory is he represented through Dillon. You're going to wind up at $30 a share, and then you'll be able to make a charitable donation to Vanguard, right? So it's somewhat different. It's different, but the terms of the agreement were that I'm only allowing you and Vanguard-affiliated investors in on this deal because on the premise that you will be donating at least 50% of your profits to Vanguard. And it was all part of a pitch that he wanted to donate at least $60 million to charities, that he was a big philanthropist, that he was, I believe the term was the COO of God because it was his obligation to do good with all the tremendous wealth that he had built, that he was also targeting specifically these people as a network of individuals who are donating to Vanguard and believe passionately about the social justice initiatives that Vanguard was supporting, and a lot of it was part of the scheme, which was to say, listen, I'm only allowing you in on this fantastic deal. And I'm even taking a risk because you're not really qualified investors. The SEC might not be happy with this. We have to keep this hush-hush in back door. The only reason I'm taking this risk on is to allow this charity to do great things, and we're all on the same team. Counsel, could I interject a question about the Treadwell issue? Yes. I think I recall Treadwell. You can correct me if I'm wrong, but my own recollection of it is that the scheme in that case, the Ponzi scheme, they involved telling the investors that a share of the profits made on the phony investment would go to charity. And so that, you know, Treadwell, you know, that was enough to bring that under that guideline. But in this case, it's a little different. It may still come under the guideline. But in this case, as I understand it, they're not saying a share of the profits will go to charity. They're saying we are contacting you because you are affiliated with this charity. Do I have that right, or is that wrong? That's only partly right, Your Honor. It is I'm contacting you because you're part of this charity. But the only reason I'm letting you on this fantastic deal where you'll be buying the shares at $3 per and will be profiting when it shoots up to $30 per share is because I have an understanding that you will be spending at least 50% of your profits putting it towards Vanguard and its social justice initiatives. Application note 7 to the enhancement specifically says that regardless of whether the defendant actually was associated with the organization, this enhancement applies when the charitable motives of the victims are exploited. And that fits perfectly with this case, Your Honor. As the district court found, and I'll point you to the excerpts of record, tab 374, pages 31, 63 to 64, Vanguard was part of the pitch. Cohen only took this or said that he was only taking this risk because he was part of the same team as Vanguard. Before your time runs entirely, I'd like to come back to the forged or not forged signature question and the IAC question. Thank you. I read Mr. Moore's report. It actually seemed pretty convincing to me that this was, in fact, Mr. Dillon's signature, or these were his signatures. Assume for purposes of this question that as a matter of professional performance that the defense lawyer should have brought in a handwriting expert. I understand this could be disputed, but assume that he should have done it. And assume that he could have shown pretty convincingly that these were not forged signatures. That then brings us to Judge Breyer's conclusion that I read, that it wouldn't have made any difference. Why is Judge Breyer right? Judge Breyer is right because, first of all, the issue wasn't the signatures per se. So this is sort of a confusing thing, which is that there's an issue of whether a person actually wrote the signature. Then there's the issue of whether that signature was placed with a document that they thought. No, no, I don't want that. I want you to assume that the expert could have convinced the jury that this very document was signed by Mr. Dillon, knowing what was in it. Okay. Well, Dillon was already extensively impeached over two days of cross-examination, over 200 pages. As was mentioned before, he specifically pled guilty to and admitted to embezzling and being a liar to specifically investors. There was also evidence of fraud after the May 2, 2004, declaration. It is incorrect what counsel said that the e-mails regarding the central moving part all preceded May 2004. I'll point this Court just to one, which is that supplemental of excerpts of record 1176. That is an e-mail dated January 14, 2005. That post states this 2004 declaration, and that talks about central moving part. Cohen got and spent $31 million. The money trail is incredible proof that these people were getting money to him based upon his misrepresentations. Also, Sam, Mary Mills, Moore, Susanna Moore, Jane Siegel, all testified as to Cohen specifically and personally telling them, after 2004, in a conference call in 2005, in a personal meeting at the Belvedere Mansion in November 2005, in the Tiburon sort of end of the whole scheme meeting in 2008, that Microsoft was acquiring e-cast, the deal was coming to fruition. I can point the pages. How were the purchases set up from, not by Dillon, but by the, I'll call them the Vanguard people, were they themselves purchasing, or was Dillon purchasing on their behalf? How were those set up? It was through, the Dillon was aggregating. So the way it was set up was Cohen said he only wanted to deal with one point person, it was Dillon. Dillon would go out to these Vanguard investors and aggregate the funds so there was one focal point. And so it was Dillon who was actually, if we were, if this were a legitimate deal, we would say that Dillon was the purchaser, and he was purchasing on behalf of others. He was purchasing on behalf of them, but Cohen knew that the investors were the ones backing it. I understand that, but what I'm trying to, what I'm trying to do is parse the language that says, in connection with Dillon's purchase of the e-cast stock, that means the purchase is on behalf of the defrauded Vanguard people. Yes, of course, Dillon wasn't the only one. There was also no deficiency, and this is very important, which is that what Dillon was saying was subject to interpretation, certainly. And the interpretation of what he said, he said specifically many, many times, questioned over maybe 30 pages. That appears to be my signature, yes, but I didn't sign the document. That was at least open to interpretation, and it cannot be found to have been objectively deficient for Linsenberg. What's so hard to be interpreted when he says, I didn't sign that document? Well, that means I didn't sign the document. Well, I didn't sign the document, but not that this isn't my signature. In other words, and what the government's position with the mills throughout and, again, I agree it's a little bit of a confusing argument, is that, look, these are the actual signatures, but they were procured fraudulently. How many people were in that position to testify? Was it just both mills and Dillon? That's right. Just three? I believe that that is right, that it was three people who testified as to that. And they all testified, that appears to be my signature, but I didn't sign that. Well, the mills actually specifically said, that is my signature, but I don't this is not the document that was, I believed I was signing. So they're the ones who have the signature page that they, right, was, they're the ones who, I think, the jury could have found from the evidence presented that they had, they signed signature pages that were later affixed to different documents. Right. And I, and with respect to the red arrow issue, I would ask this Court to look at the excerpts of record, compare 1896 to 1897, 1907 to 1908, because that shows what the government was saying, which was not that these aren't the signatures that Mary Mills actually signed these two pages, but that Cohen was fraudulent in saying that these were the same page, that it was two versions of her signature. 1896, 1897, and what else? 1907 and 1908. They're supposed to be the same page. And you see different, just with respect to the signature line, it's different. You know, the, this Court, we believe, should deny Cohen's request. Cohen has not met his burden on either the deficiency or the prejudice prong. Okay. Judge Gould, I hear you have a question. Yeah, I have one question. I want to take you way back to the beginning of this argument by Appellant. Okay. And the question I asked Appellant's counsel, does the government agree and take the position that our panel should now, on direct appeal, decide the IAC, the ineffective assistance of counsel, claim that the record's sufficiently developed, or does the government, and that it comes within the exception to our general rule, or does the government take the position that the, that claim, that claim should be dismissed without prejudice to presenting it in a 2255? Well, our position, I hope this answers directly, our position was that it should be deferred to the habeas proceeding as it usually is. But because the defendant is so eager for this to be decided, we believe that there is sufficient evidence on this record to decide it, to decide and affirm the district court's holding that there was no ineffective assistance of counsel. And that's clear under Harrington v. Richter. So why do you, why do you recommend that we defer it to a 2255? We don't, we don't anymore, but we would, we do believe that there's enough for you to deny it. So you don't, you did recommend it, you don't recommend it any longer, you'd like, you'd like it to be decided? I would like it to be decided. In light of what you might have heard today? I would like it to be decided. Not just in light of what I've heard today, but I would like it to be decided. And, you know, Your Honor, I don't know if you have any questions about this cross-examination on the plea agreement, but there was plenty of cross-examination. He was thoroughly impeached. The defense counsel made full use of it in his closing argument. And I just wanted to point out one thing, which was with respect to the sentencing issue, there is an amended judgment that I only discovered last night in preparing for this argument, and that's at docket 421. And that amended judgment was filed after, was based on restitution proceedings that occurred in June, prior to the beginning of this appeal, but after the submission of the opening brief. And I apologize for not finding it before yesterday, but it does, the reason I bring it up is because it includes a specific finding of loss, as well as an amendment, a finding of the number of victims attached to restitution. Thank you very much, Your Honor. Yeah, counsel, wait, one question. Sorry, Judge Golden has a question. Yes, I will. Yeah. Does, I feel like I may be riding a horse that's not going anywhere. I apologize if I'm that horse. It's okay. No, not, that's not what I'm saying. But does the record contain an affidavit of the trial counsel saying, here is why I did what I did, or didn't do what I didn't do, on the issues that the appellant urges call for reversal for ineffective assistance of counsel? It does not. All that was attached was an email, and it was a very casual email, where Mr. Linsenburg said, I'm focused elsewhere. I believe he was in trial, and we're talking about something else. But kind of offhandedly said, but my recollection is that Dillon essentially acknowledged his signatures. And I guess I'm, I don't quite understand why the government is eager for us to decide this on this record now. Because, I mean, the appellant's counsel makes a pretty good argument that impeachment on the subject matter of the fraud might be more powerful than impeachment on collateral matters. Your Honor, if this Court wants to defer it, we think that either position is legally sound. And if this Court wants to defer it, we think that that there's plenty of basis in the law for doing so. Mr. Moore's deferred a rule for the government, but not rule for the appellant. Mr. Moore's report looks pretty convincing. Mr. Moore's might have two different views on that. Mr. Moore's report, for example. I'm sorry. I'm just teasing you. Okay. Well, I was going to say that his – I think, you know, with respect to, for example, the Mills, he didn't really have a basis for making any rule finding. Okay. We got it. All right. Thank you, Your Honor. Please affirm. And the dead horse, I was wondering if I was beating a dead horse. It didn't relate to your argument. Thank you, Judge Gold. Okay. Thank you. Mr. Tappell, why don't we put two minutes on the clock and see what happens? I will endeavor to complete that. As far as Mills's opinion and his denial that the signatures were his, I cite you to ER 258 at 507, line 4, through 509, line 14. And as to the confusion that – at least I sense some confusion as to Mrs. Mills' testimony. Mr. Moore's subsequent report shows that there was no question, or at least there was little question, that the entire document was presented. Treadwell, the – to your question, Judge Christensen, and Treadwell talks about a situation where there is always a direct representation by whomever it is that is soliciting the money that that person or that entity will be giving money to the charity. Right. We haven't applied it this way, right? No. It's never been applied this way. Has anybody applied it this way? We know of no case this is a novel approach that they're talking about, and that Why are they wrong, counsel? Why are they wrong that the charitable enhancement isn't well-suited to this, if they really are appealing to a group of folks who are, you know, philanthropists who want to give to charity? Because its application would be incredibly difficult to apply in our society. Let me just pause at a very quick hypo because I don't have much time. I want to get to other things. Suppose a bank is handling the funds of a charitable organization, as they often do, and they say, buy these very, very good securitized mortgages, which we stand behind, and you'll have money to give to your people. And the argument is that there might be recourse under fraud statutes under that statement that they will be giving money to a charity. I think just as a policy decision, it's far too broad. De novo review is the standard, Judge Fletcher, on the review of this, I think, very, very serious IAC problem. Judge Breyer has expressed his review, his view, but it is one which we strongly disagree with, especially when you see the quality of the collateral, so-called collateral evidence. There are three or four witnesses who gave their testimony under lawsuits for their fraud in connection with Dillon, had previously met with a lawyer in 2008 who sent them out to get incriminating information because they had none, and yet at trial they testified about supposed conversations they had back in 2005 with Mr. Colin. Moreover I did not, and if you took from this, it was not my intent to say that the e-mails were all before the declaration. There were a few after using that term, but just to point out that the only person who was subject to a considerable amount of discrediting and skepticism. And finally, as to all the conduct of the various people, all circled through Dillon. They were associated with Dillon, the Mills, Moore, et cetera, et cetera. Everything came through Dillon, and throughout the case when the government would assert that Colin said, Colin announced, Colin this, Colin that, it was all by way of Dillon, or supposedly in one or two meetings where it was very vague as to what was said, and the witnesses to the meeting, and particularly the 2005 meeting, completely disagreed with each other about whether anything was said as to Microsoft taking over ECAS. We laid this all out in our briefs, and in closing all I can say, I thank you for the extra time. It was very helpful for me to be able to give out the argument, but that the case is terribly infected by this, and it's a process issue with the question of inadequate representation, and the question at the end of the day is, would the likelihood reasonably have been affected, is our confidence undermined, and I submit to this Court that it must be under these circumstances. Thank you so much. Thank you. Thank you. Thank both sides for your arguments. The United States v. Colin is now submitted for decision, and that completes our argument for this morning.
judges: Fletcher, Gould, Christen